IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIMBERLEY S. VESCERA,            )
                                 )
            Plaintiff,            )
                                 )
                                 )   CIVIL ACTION NO. 3:11-00122
v.                               )   JUDGE KIM R. GIBSON
                                 )
DRS LAUREL TECHNOLOGIES,         )
                                 )
            Defendant.           )
                                 )

## MEMORANDUM AND ORDER OF COURT

### I.    SYNOPSIS

This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc.

No. 24), which Plaintiff opposes.  For the reasons that follow, the Court will **DENY** Defendant's

motion.

### II.   JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 621 et seq.

Venue is proper under 28 U.S.C. § 1391(b).

### III.  BACKGROUND

This case arises from a dispute between Plaintiff Kimberly S. Vescera ("Vescera") and

her former employer, Defendant DRS Laurel Technologies ("DRS"). Located in Johnstown,

Pennsylvania, DRS supplies products and services for militaries, intelligence agencies, and

contractors. (Doc. Nos. 30; 26 at ¶ 1). Vescera began her employment with DRS in July 2008.

(Doc. Nos. 30; 26 at ¶ 2; 25-2 at 3). During the course of her employment she performed several

roles, and was supervised by Travis Turchak. (Doc. Nos. 30 at ¶ 7; 26 at ¶ 8; 25-2 at 6). In Vescera's January - December 2009 performance review, Turchak wrote that Vescera was a solid performer who consistently met his expectations. (Doc. No. 29-7). While at DRS, Vescera also worked with Ronald Coleman. (Doc. Nos. 30 at ¶ 9; 26 at ¶ 10). Coleman was Turchak's "go to person" in Vescera's work area, answering questions for Vescera regarding paid time off, and assisting Turchak in assigning employee's work. (Doc. Nos. 30 at ¶ 10; 29-2 at 4-5). Vescera also performed Coleman's job when he was absent from work.  (Doc. No. 25-2 at 9).

The case arises from Vescera's allegation that Coleman sexually harassed her during her time working at DRS. (Doc. Nos. 30 at ¶ 9; 26 at ¶ 10). The harassment is alleged to have begun on her first day of work in July 2008, when Coleman told Vescera she "f****** irritated" him. (Doc. Nos. 30 at ¶ 15; 26 at ¶ 10; 25-2 at 9). Vescera did not report this first incident to anyone at DRS. (Doc. Nos. 30 at ¶ 16; 26 at ¶ 11; 25-2 at 36). Later, Coleman allegedly grabbed Vescera's arm on two instances, the first of which occurred in July 2009. (Doc. Nos. 30 at ¶¶ 17-18; 26 at ¶¶ 12-13). Vescera alleges Coleman grabbed his genitals in front of her on Oct. 21, 2009 (Doc. Nos. 30 at ¶ 21; 26 at ¶ 16), and grabbed her arm a second time on Oct. 28 or 29. (Doc. Doc. Nos. 30 at ¶ 20; 26 at 15). Vescera states that she reported the July arm-grabbing incident to Turchak. (Doc. Nos. 30 at 19; 29-3 at 10).[1] DRS maintains that Vescera never reported the altercation. (Doc. Nos. 26 at ¶ 14; 25-2 at 14). Turchak recalled a July 2009 meeting with Vescera where she was upset about Coleman, but refused to give details. After that meeting, Turchak supposedly told Coleman not to have contact with Vescera. (Doc. Nos. 29-2 at 11; 25-1 at 5).

In early November 2009, Vescera reported the October arm-grabbing incident to Jennifer

---

[1] Plaintiff's assertion in the CSMF contradicts Vescera's own deposition testimony. (Doc. No. 25-2 at 18).

Hall in DRS' human resources department. (Doc. Nos. 30 at ¶ 22; 26 at 18; 25-2 at 16). The next day Vescera met with Hall, Turchak, Amy O'Hara (another human resources representative) ("O'Hara"), and Brad Otten (a production supervisor) ("Otten"). (Doc. Nos. 30 at ¶ 23; 26 at ¶ 18; 25-2 at 16). At that meeting Vescera explained she had previously complained to Turchak three times about Coleman's behavior. (Doc. Nos. 30 at ¶ 24; 26 at ¶ 20; 25-2 at 18). Vescera alleges Turchak knew about Coleman's conduct, which consisted of Coleman referring to her as a "f****** b****" and "f****** c****". (Doc. Nos. 25-2 at 18; 25-3 at 2). DRS alleges that Vescera's prior complaints to Turchak about Coleman concerned only work related disputes. (Doc. Nos. 26 at ¶ 22; 25-1 at 5). Turchak had moved Coleman around their work area, away from Vescera, three different times. (See No. 25-2 at 18). Amy O'Hara "vaguely" remembered that Turchak was blamed for not reporting incidents between Vescera and Coleman to HR prior to the November 2009 meeting. (See Doc. No. 29-3 at 2). After the meeting, Coleman was told not to have contact with Vescera, and she was moved to another work area away from Coleman. (Doc. Nos. 30 at ¶¶ 25-26; 26 at ¶¶ 27-28; 25-1 at 6). Around late January 2010, Vescera filed a "charge of discrimination" with the U.S. Equal Employment Opportunity Commission ("EEOC") (Doc. Nos. 1 at ¶¶ 22, 34; 6 at ¶¶ 22, 34).

During Vescera's time with DRS, including January and February 2010, she incurred warnings regarding her number of absences. (Doc. Nos. 30 at ¶¶ 32-33; 26 at ¶¶ 34-35; 25-1 at 6). On March 2, 2010, Otten met with Vescera to discuss her attendance. (Doc. Nos. 30 at ¶ 33; 26 at ¶ 36, 25-1 at 7). As Otten attempted to discuss Vescera's absences, she threw the warning papers back at him and told him he would hear from her lawyer. Moments later Vescera told Otten he could shove the papers "up his ass." (Doc. Nos. 30 at ¶ 34-35; 26 at ¶ 37-38; 25-2 at 23). DRS planned to issue Vescera a two day suspension for her behavior, and on March 3,

accompanied by a security guard, Otten and Carrie Liska (another HR rep) ("Liska") attempted to present Vescera with a suspension letter. (Doc. Nos. 30 at ¶¶ 36-37; 26 at ¶¶ 39-40; 25-1 at 9). Vescera refused to meet with them, and became loud when approached by a security guard. (Doc Nos. 30 at ¶ 41; 26 at ¶ 44). Vescera was told to leave the building and that she was suspended for two days. (Doc. Nos. 30 at ¶¶ 39-46; 26 at ¶¶ 41-50; 25-1 at 6, 8, 10). The next day, on March 4, Vescera received a certified letter that informed her she was terminated from DRS. (Doc. Nos. 30 at ¶48; 26 at ¶ 52; 25-5 at 2). According to Vescera, she knew she was going to be fired the week before. (Doc. No. 29-4 at 18).

In May 2011, Vescera commenced the instant action by filing a complaint against DRS, alleging claims of retaliation and hostile work environment under Title VII and the Pennsylvania Human Relations Act (PCRA). (See Doc. No. 1). The parties progressed through discovery, and DRS filed the instant Motion for Summary Judgment (Doc. No. 24) on July 13, 2012. Vescera responded on September 13, 2012. (Doc. No. 29). This motion has been fully briefed (See Doc. Nos. 25, 26, 29, 30, 33) and is now ripe for disposition.

## IV.     STANDARD OF REVIEW

"Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56 (a).[2] Issues of fact

---

[2] Rule 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified as subsection (a).
The language of this subsection is unchanged, except for "one word—genuine 'issue' bec[ame] genuine 'dispute.'" Fed. R. Civ. P. 56 advisory committee's note, 2010 amend.

4

are genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those which will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248.

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleading," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (internal citations omitted); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); see also *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

## V.   DISCUSSION

DRS argues that summary judgment against Vescera is appropriate in this case because (1) Vescera has not alleged sufficient facts to support a *prima facie* case of hostile work environment under Title VII and the PHRA against DRS; (2) Vescera cannot support a *prima facie* case of retaliation against DRS; and (3) Vescera cannot show that DRS' proffered reason for terminating Vescera was a pretext for retaliation in response to Vescera's complaints about her alleged harassment by Ronald Coleman.[3] The Court will consider each argument in turn.

---

[3] Plaintiff's complaint sets forth three counts: 1) Title VII (Sex Discrimination/Harassment), 2) Title VII (Sex Discrimination) (Retaliation), and 3) Pa. Human Relations Act ("PHRA") 43 Pa. C.S.A. § 951. (See

## A. Sexual Harassment Claim: Hostile Work Environment

Title VII[4] of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition, "[i]t is well established that a plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999). To bring a successful claim for a sexually hostile work environment "five constituents must converge ... (1) the employe[e] suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990).

---

Doc. No. 1). Although Plaintiff's Complaint does not explicitly use the term "hostile work environment" at Count I, the allegations contained therein amount to such an allegation, and the Court will analyze this Count in relation to Defendant's instant motion under such a claim. Defendant's motion for summary judgment seeks to dismiss 1) Plaintiff's Title VII and PHRA claims, and 2) retaliation claim. (See Doc. No. 25). In setting forth its arguments regarding the former, Defendant presents two primary contentions: 1) Plaintiff is unable to establish a *prima facie* case of sexual harassment based on the existence of a hostile work environment, and 2) Plaintiff cannot carry its burden in showing that Defendant's termination actions were pretext for discrimination. As for its arguments concerning retaliation, Defendant makes two arguments: 1) Plaintiff cannot support a *prima facie* case of retaliation, and 2) Plaintiff cannot show pretext to support her claim of retaliation. Inasmuch as Defendant seeks to show that Plaintiff cannot carry her burden for the allegation of pretext as required under the *McDonnell Douglas* approach, Defendant asserts this argument both in relation to the hostile work environment allegation and the retaliation allegation. Because courts conduct the pretext analysis with specific regard to retaliation allegations under Title VII discrimination claims, rather than in relation to hostile work environment allegations, this Court will consider Defendant's argument regarding Plaintiff's failure to show pretext as the basis for termination in relation to its analysis of Defendant's retaliation argument analyzed in Section V.B.2. See *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289 (3d Cir. 1999); see also *Yaeger v. UPMC Horizon*, 698 F.Supp. 2d 523 (W.D. Pa. March 17, 2010).

[4] Title VII and PHRA claims are analyzed similarly. *Atkinson v. LaFayette College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006); see also *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996).

DRS asserts that Vescera's hostile work environment sexual harassment claim should be dismissed because Plaintiff is unable to satisfy the final element of *respondeat superior* liability. (See Doc. No. 25 at 11). When a plaintiff seeks to establish *respondeat superior* liability, "the basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a coworker." *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). "When the hostile work environment is created by a victim's non-supervisory coworkers the employer is not automatically liable." *Id.* "Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.* If "an employer's response stops harassment," however "there cannot be Title VII liability." *Kunin*, 175 F.3d at 294.

DRS argues Vescera cannot prove DRS' *respondeat superior* liability because Coleman was Vescera's co-worker, not her supervisor. (See id.). Concomitantly, DRS also contends that Vescera was provided a reasonable avenue for complaint, to which DRS adequately responded. Vescera challenges these averments by arguing that Coleman was her supervisor, and that DRS' reaction to her complaints about Coleman's harassment was inadequate and failed to remedy his behavior. (See Doc. No. 29 at 2-4). Although the Court finds that Coleman was not Vescera's supervisor, there does exist a genuine issue of material fact as to whether DRS adequately responded to Vescera's complaints. These issues will be addressed in turn.

**1. Coleman was Vescera's co-worker, not supervisor**

When Congress passed Title VII, it "intent[ed] to place some limits on the acts of employees for which employers ... are to be held responsible" *Meritor Sav. Bank, FSB v.*

*Vinson*, 477 U.S. 57, 72 (1986). To that end, "an employer is subject to vicarious liability to a victimized employee" if the "hostile environment [is] created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Conversely, employers are not automatically liable for harassment between mere co-workers. See *Huston*, 568 F.3d at 104-105.

The line between a supervisor and a co-worker is not always clear. As the Third Circuit explained in *Neely v. McDonald's Corp*, for instance, even "assistant managers" are not necessarily supervisors for purposes of Title VII *respondeat superior* liability. See *Neely v. McDonald's Corp.*, 340 F. App'x 83, 85 (3d Cir. 2009). The court explained that an employee's title is irrelevant if the label does not "bestow upon him the authority to hire, fire, and discipline the staff he worked with during his shift." *Id.* The assistant manager "neither scheduled the staff on his shift nor assigned them to work stations." *Id.* Instead, the store manager "was responsible for the operations of the restaurant and answered to upper management." *Id.* In fact, even a "supervisor" is not a supervisor for purposes of Title VII if the employee still performs the same function as the workers he or she oversees. See *Griffin v. Harrisburg Prop. Services, Inc.*, 421 F. App'x 204, 209 (3d Cir. 2011) (internal quotes omitted). Instead, under Title VII, a supervisor is an employee with "a mandate generally to regulate the workplace environment." *Id.* (internal quotes omitted).

Defendant alleges that Coleman was Vescera's co-worker, and not her supervisor because he was not "a 'management-level employee.'" (See Doc. Nos. 25 at 11; 26 at ¶¶ 8, 10, 11). Plaintiff challenges this assertion and argues that "Coleman was a supervisor as DRS treated him as a supervisor." (Doc. No. 29 at 1). In disputing Coleman's employment status with DRS, Plaintiff points to unsubstantiated factual allegations concerning informal acknowledgments

8

about Coleman being Turchak's "go to person who made sure things ... got done." (Id.). Additionally, Plaintiff points to Defendant's own Concise Statement of Material Facts ("CSMF") concerning the movement of Vescera to a new position vis-à-vis Coleman. (Id. at 2). Plaintiff, however, mischaracterizes the underlying factual content of these averments present in the parties' CSMFs and accompanying exhibits. Additionally, without presenting any holding authority on why these characterizations should lead to a legal determination that Coleman was a supervisor, Plaintiff's attempt to fashion the parties undisputed facts[5] concerning Coleman's status as equivalent to being Vescera's supervisor does not sufficiently present a genuine dispute of material fact regarding this issue.

Vescera herself admitted Coleman was not her supervisor. (See Doc. No. 25-2 at 9). Instead, Vescera identified Travis Turchak as her supervisor. (Id. at 6). Turchak's description of Coleman as Vescera's "co-worker" supports this contention. (See Doc. No. 25-1 at 5). Titles alone, however, are not dispositive. See Griffin, 421 F. App'x at 209. But Vescera also "took over" Coleman's job when he was away, which suggests Vescera and Coleman performed similar work duties. (See Doc. No. 25-2 at 9). Turchak also indicated that advice given by Coleman to Vescera regarding time off was inappropriate, and instead should have come from Turchak. (See Doc. No. 29-2 at 4-5). Also, Vescera did not allege that Coleman possessed the authority to hire, fire, and discipline DRS employees. Under the totality of the facts as presented

---

[5] For example, in support of Defendant's motion, its CSMF points to facts in the record that stipulate that Vescera admitted Coleman was not a supervisor, but merely a co-worker. (See Doc. Nos. 26 at ¶¶ 10-11; 25-2 at 8-9). Attempting to counter this fact, Plaintiff's responsive CSMF asserts a fact describing Turchak's understanding of Coleman's employment role. (See Doc. 30 at 2). Presentation of this characterization, however, in Plaintiff's responsive filings is not sufficient to present a disputed fact because first, Plaintiff's CSMF allegation is not directly contradictory to Coleman being merely a co-worker, and second, Plaintiff has not sufficiently established that this type of characterization of Coleman's role under Turchak is necessarily material to the determination of whether Coleman was considered to be a supervisor to Vescera.

by the parties and in light of the supporting documentation, the Court finds that Coleman was merely Vescera's co-worker and not her supervisor.

## 2. Reasonable avenue and remedial action for harassment complaints

DRS argues that Vescera has not alleged sufficient facts to support the conclusion that DRS failed to adequately respond to Vescera's complaints about Coleman. (See Doc. No. 25 at 11). Vescera disputes this by arguing there is sufficient evidence to show that DRS' response to addressing the complaints were inadequate, such that *respondeat superior* liability attaches even if Coleman is merely a co-worker. (See Doc. No. 29 at 2-3).

In a Title VII hostile work environment case, an "employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment." *Huston*, 568 F.3d at 105. An employer "knew or should have known about workplace sexual harassment if management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment." *Id.* (internal quotes omitted). Constructive notice of a hostile work environment is imputed to the employer if "an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer." *Id.* (internal quotes omitted). In this context, however, "mere supervisory authority over the performance of work assignments by other co-workers is not, by itself, sufficient to qualify an employee for management level status." *Id.* at 108. Instead, "an employee's knowledge of allegations of coworker sexual harassment may typically be imputed to the employer in two circumstances." *Id.* at 107. In the first situation, the alleged harassment is reported to an employee "sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him ... so that such

10

knowledge is important to the employee's general managerial duties." *Id.* Alternatively, "an employee's knowledge of sexual harassment will be imputed to the employer where the employee is specifically employed to deal with sexual harassment." *Id.*

Where "a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment," the onus is on the employer to "take prompt and adequate remedial action." *Andrews*, 895 F.2d at 1486. "An effective remedy - one that stops the harassment - is adequate per se." *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006). But "[e]ven if not effective, an employer's remedial measure is nonetheless adequate if 'reasonably calculated' to end the harassment." *Id.* (citing *Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n. 8 (3d Cir.1997)). In addition, "the remedy need not include discipline to be adequate." *Jensen*, 435 F.3d at 453.

As a preliminary matter, it is unclear in this case when Vescera first approached Turchak about Coleman. According to Vescera she did not go to Turchak after the July 2009 incident when Coleman allegedly grabbed Vescera. (See Doc. No. 25-2 at 18). As Turchak recalls, however, he had a July 2009 meeting with Vescera where she was "visibly upset, saying she couldn't work with [Coleman] anymore," but "refused to give ... details." (See Doc. No. 29-3 at 10). The next day Turchak reportedly told Coleman not to have contact with Vescera. (See Doc. Nos. 29-2 at 11; 25-1 at 5). More significantly, Turchak reported that after the July 2009 incident, Coleman and Vescera, "seemed able to function effectively as co-workers," and that Vescera's subsequent complaints about Coleman related to the way work was assigned in their area. (See Doc. No. 25-1 at 5).

This assertion, however, contradicts statements made by Vescera and Amy O'Hara. Contrary to Turchak's claim that Coleman and Vescera worked satisfactorily together, Vescera

reported approaching Turchak three times regarding Coleman's harassment. (See Doc. No. 25-2 at 18). At her November 2009 meeting with human resources, Vescera stated that she explained Turchak "knew everything" about Coleman's behavior, which, she reported, consisted of chauvinist epithets. (See id.) In response, Turchak had moved Coleman away from Vescera around their work area three times. (See id.). Amy O'Hara recalled "vaguely" that Turchak was blamed for not reporting incidents between Vescera and Coleman to human resources prior to the November 2009 meeting. (See Doc. No. 29-3 at 2). O'Hara's indefinite recollection supports Vescera's claim that she had complained to Turchak on more than one occasion, and Vescera's description of the harassment to DRS human resources in November 2009 undermines Turchak's claim that Vescera's complaints about Coleman related to mere work assignments. Vescera's subsequent transfer from Coleman's work area in November 2009 appears to have curtailed his abuse, but only after what could have been, taking all inferences in favor of Vescera, several months of harassment and complaints to Turchak.

Whether Turchak's admonitions of Coleman and Vescera's transfer were a sufficient response is an issue of reasonableness. "To be reasonable," an employer's "remedy must be both adequate and prompt." *Jensen*, 435 F.3d at 453. In this case, Turchak's conversation with Coleman regarding the July incident and Coleman's three re-assignments around the work area seemed inadequate as a remedy to change his subsequent behavior. In actuality, Coleman seemed to have "felt free to continue his harassment." *Knabe*, 114 F.3d at 413. Later, Vescera's transfer across the factory appears to have successfully stopped Coleman, but "[t]he effectiveness of so modest a remedial measure raises a question as to why, despite [Vescera's] repeated complaints, it took ... months of harassment and the intervention of a new supervisor to make it happen." *Jensen*, 435 F.3d at 453. In actuality, the series of events is readily "subject to an inference that

[DRS] was less than vigorous in addressing plaintiff's complaint." *Mincin v. Shaw Packing Co.*, 989 F. Supp. 710, 719 n.3 (W.D. Pa. 1997). Thus, the Court finds that there exists a genuine dispute as to whether DRS' responses to Vescera's grievances were adequate under the circumstances, and as such a reasonable jury could disagree as to this issue. On this basis, Defendant's motion for summary judgment cannot be sustained.

## B.  Retaliation Under Title VII

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must proffer evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). "If the employee establishes this *prima facie* case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Id.* at 342 (internal quotes omitted). If the employer does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (internal quotes omitted). DRS makes two arguments in its motion with regard to retaliation. First, that Vescera has failed to establish the third element of her *prima facie* case; namely, the existence of a causal connection between Vescera's participation in a protected activity and her subsequent firing. And second, Vescera cannot show DRS' reasons for terminating her employment were pretextual.

### 1.  Causal connection

In evaluating claims for retaliation, "timing and ongoing antagonism have often been the basis for the causal link," but plaintiffs may "substantiate a causal connection for purposes of the

13

*prima facie* case through other types of circumstantial evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000). This evidence may include inconsistent reasons for termination, a pattern of antagonism, "temporal proximity between the events plus inconsistencies in the defendant's testimony, certain conduct towards others, and refusals to provide a reference for the plaintiff." *Id.* at 281. Essentially, there are "no limits on what [courts] have been willing to consider." *Id.*

In the Third Circuit, the "case law is seemingly split as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a *prima facie* case of retaliation." *Farrell*, 206 F.3d at 279 (3d Cir. 2000) (internal quotes omitted). "[T]his 'split' is not an inconsistency in our analysis but is essentially fact-based," and courts rule differently "depending, of course, on how proximate the events actually were." *Id.* For a court to find a sufficient causal connection based on temporal proximity, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (internal quotes omitted). "There is no bright line rule as to what constitutes unduly suggestive temporal proximity," but "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation ...." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007). A gap of two days between the protected activity and a plaintiff's discharge, on the other hand, is unduly suggestive. See *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).

In this case the temporal proximity between Vescera's charge of sexual harassment to the EEOC and her discharge could allow a reasonable factfinder to infer DRS retaliated against Vescera. According to Turchak's description of Vescera's work in her January - December 2009

14

performance review, Vescera was a solid performer who consistently met Turchak's expectations. (See Doc. No. 29-7). Vescera, noted that Vescera, "had a good 2009, and should look forward to an even more productive 2010." (Id.). Soon after, on or about January 29, 2010, Vescera filed her EEOC complaint against DRS. (See Doc. No. 1 at 5). Approximately one month later, on March 4, Vescera was fired. (See Doc. No. 25-5 at 2). This time period of about thirty days is closer to the endpoint of the unduly suggestive side of the temporal spectrum recognized by the Third Circuit. Compare *Jalil*, 873 F.2d at 708 with *LeBoon*, 503 F.3d at 233. Thus, there would appear to be a sufficient basis to find a causal nexus here.

A court should be cautious, however, when inferring causation based on temporal proximity alone. See *Sampath v. Concurrent Techs. Corp.*, CIVA 3:03-CV-264, 2008 WL 868215 at *48 (W.D. Pa. Mar. 31, 2008) (finding a sufficient causal connection where there was a two month gap between protected activity and adverse employment action with additional evidence of antagonism). In this case, though, like in *Sampath*, other alleged evidence may be considered by a reasonable factfinder to bolster Vescera's retaliation claim in addition to the presence of temporal proximity. Upon Vescera's documented suspension from work for an altercation taking place immediately prior to her termination, she claims that she "knew [she] was getting fired because someone there told [her she was getting fired] a week before" the altercation occurred.[6] (Doc. Nos. 30 at 5-6; 29-4 at 18). Vescera's contention gives rise to the possible inference that DRS may have "seized upon [an] instance of insubordination to fire" Vescera, despite her reportedly solid performance. *Jalil*, 873 F.2d at 709. For these reasons, the Court finds that there exists a genuine dispute of material fact as to whether Vescera can sufficiently establish a causal connection between the protected conduct and her discharge.

---

[6] It should be noted here that, if true, Vescera's allegation that DRS actually made plans to fire her before March 2010 would make the temporal proximity between her EEOC complaint and the decision to discharge her less than one month.

Thus, because a reasonable factfinder could find the existence of this third element and that Plaintiff has properly alleged a *prima facie* case of retaliation, Defendant's motion is denied.

### 2. Defendant's reasons as pretext for termination

Once Plaintiff alleges a *prima facie* case of retaliation, the burden shifts to Defendant "to advance a legitimate, nondiscriminatory reason for discharging" Vescera. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989); see also *Norman v. Kmart Corp.*, 485 Fed. Appx. 591, 591-93 (3d Cir. 2012). Once Defendant meets this burden, Plaintiff must present, "evidence rebutting the employer's proffered legitimate reasons" for his or her termination, and this evidence, "must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (internal citations omitted) (italics original). The plaintiff need only point "to 'some' evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated (pretextual)." *Id.* In so doing, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (internal quotes omitted). To make that determination, "the plaintiff's evidence might serve both to establish a prima facie case and discredit a defendant's explanation." *Jalil*, 873, F.2d at 709 n.6.

In this case, DRS advanced a legitimate, nondiscriminatory reason for firing Vescera, and met its "burden by introducing evidence that plaintiff was fired for ... insubordination." *Jalil*, 873 F.2d at 708. (See Doc. No. 25-5 at 2). In fact, Vescera concedes that she behaved badly when confronted by DRS about her attendance. (See Doc. No. 29-4 at 17). For similar reasons

16

that Vescera makes her *prima facie* case, however, a reasonable factfinder could find that DRS' proffered reason is pretextual. Again, Vescera was, by her supervisor's own account, a good employee. (See Doc. No. 29-7). Vescera's employment was terminated about one month after she lodged a charge of discrimination with the EEOC. (See Doc. Nos. 1 at ¶¶ 22, 34; 6 at ¶¶ 22, 34; 26 at 5; 30 at 7). Vescera alleged that DRS planned to fire her before she acted out in response to the written warnings. (See Doc. No. 29-4 at 18). Vescera had a troubled history with her co-worker, Coleman, who was "integral to the business functioning" of his work group. (See Doc. No. 25-1 at 6). Taken together, these facts regarding the sequencing, motivations, and underlying relationships between the various employees paints a picture that could be considered to serve as a pretextual basis for which DRS terminated Vescera in the presence of allegedly discriminatory behavior on the part of Coleman.

Vescera's history, taking all inferences in her favor, could give rise to the interpretation that DRS seized upon an "instance of insubordination to fire" her. *Jalil*, 873 F.2d at 709. For these reasons, the Court concludes that a reasonable factfinder could determine DRS' proffered non-discriminatory reason to discharge Vescera was pretextual and that DRS acted with retaliatory intent. Thus, a genuine dispute as to a material fact exists for which a jury would be better positioned to make a determination. Accordingly, Defendant's motion is denied on these grounds.

## VI.   CONCLUSION

Plaintiff has alleged that her rights were violated under Title VII and the PHRA, based on claims of sexual harassment arising from a hostile work environment and from retaliatory action taken by her employer. Defendant's motion for summary judgment sought a dismissal of these

claims based on Plaintiff's failure to state a *prima facie* case for each and her inability to show Defendant's reason for her employment termination as being pretextual.  For the reasons set forth in this Memorandum, the Court finds that the Plaintiff has alleged sufficient facts to meet her *prima facie* case, as well as sufficiently carried her burden on summary judgment to produce evidence highlighting several genuine disputes as to the material facts underlying these claims. Because a reasonable jury could differ as to the determination of these disputes, the Court **DENIES** Defendant's motion for summary judgment (Doc. No. 24).  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIMBERLEY S. VESCERA, )
)
Plaintiff, )
) CIVIL ACTION NO. 3:11-00122
v. ) JUDGE KIM R. GIBSON
)
DRS LAUREL TECHNOLOGIES, )
)
Defendant. )
)

## ORDER

AND NOW, this 15th day of March 2013, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 24), and in accordance with the Memorandum, **IT IS HEREBY ORDERED** that the motion is **DENIED**.

BY THE COURT:

KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE